302 A.2d · 793.

DALE HARTER *vs.* THE HOME INDEMNITY COMPANY.

APRIL 4, 1973.

PRESENT: Roberts, C. J., Paolino, Powers, Joslin and Kelleher, JJ.

PAOLINO, J.   On September 3, 1968, the plaintiff, as father and sole beneficiary of his minor son, Dale R. Harter, Jr., brought this action for wrongful death against the defend-

ant insurance company pursuant to the provisions of G. L. 1956 (1968 Reenactment) §27-7-2.[1]  On February 5, 1970, a justice of the Superior Court granted the defendant's motion for a preliminary hearing to determine whether it was a proper party defendant, whether proper service had been made on it, and whether the plaintiff had complied with the provisions of §27-7-2.  The trial justice assigned the matter to the jury trial calendar.  Later in this opinion we shall discuss the procedure followed in this case.

The case was heard on this limited issue before a justice of the Superior Court sitting with a jury.  The plaintiff's motions for a directed verdict at the close of his case and at the close of defendant's case were denied.  The jury returned a verdict for plaintiff on the limited issue submitted to it.  The case is before us on plaintiff's appeal from an order entered by the trial justice granting defendant's motion for a new trial.

The plaintiff contends that the trial justice erred in granting defendant's motion for a new trial.  The determination

---

[1]General Laws 1956 (1968 Reenactment) §27-7-2 permits an action directly against an insurer if the process which originally issued against the insured has been returned *"not est inventus"* by the officer charged with its service. *Petitpas* v. *Merchants Mutual Ins. Co.*, 103 R.I. 479, 238 A.2d 750 (1968); *Collier* v. *Travelers Ins. Co.*, 97 R.I. 315, 197 A.2d 493 (1964).

Section 27-7-2 reads as follows:

"Such injured party, or, in the event of his death, the party entitled to sue therefor, in his suit against the insured, shall not join the insurer as a defendant. If, however, the officer serving any process against the insured shall return said process 'non est inventus,' the said injured party, and in the event of his death, the party entitled to sue therefor, may proceed directly against the insurer. Said injured party, or, in the event of his death, the party entitled to sue therefor, after having obtained judgment against the insured alone, may proceed on said judgment in a separate action against said insurer; provided, however, that payment in whole or in part of such liability by either the insured or the insurer shall, to the extent thereof, be a bar to recovery against the other of the amount so paid."

of this issue depends upon the answer to a preliminary question, namely, did plaintiff make a good faith effort to serve the insured Robert Kingman prior to bringing suit against defendant insurance company, that is, did he make a reasonably diligent effort to obtain service on the insured such as would be made if no question of insurance were involved? *Petitpas* v. *Merchants Mutual Ins. Co.*, 103 R. I. 479, 238 A.2d 750 (1968); *Collier* v. *Travelers Ins. Co.*, 97 R. I. 315, 197 A.2d 493 (1964). The answer to the preliminary question requires a discussion of the evidence in some detail.

On September 5, 1966, plaintiff's minor son was killed in an automobile accident involving Robert Kingman, an insured of defendant. The plaintiff retained Leonard Decof, Esq., a partner in the firm of Aisenberg, Decof and Dworkin, to prosecute the death action and gave him pertinent information about the accident, including the name and address of the driver and owner of the vehicle involved, namely, Robert Kingman, 418 Arnold Road, Coventry, Rhode Island. Mr. Kingman was a resident of Coventry, living at 418 Arnold Road, a home that he and his wife had purchased in 1959. The plaintiff's condition, as a result of his boy's death, and the death of his wife in childbirth within a week prior to the boy's death, prompted an agreement between plaintiff and Decof that the latter would "handle everything" and that plaintiff to the extent possible would not be involved.

On September 15, 1966, Decof sent a letter addressed to Kingman at 418 Arnold Road indicating that he represented plaintiff and suggesting that he turn the letter over to his insurance carrier. This letter was received by Kingman and delivered by him personally to defendant. The defendant contacted Decof and settlement negotiations followed.

Mr. Kingman continued to live at his Coventry home until March, 1968, when he was recalled to active duty with

the Marine Corps and assigned to Camp LeJeune, North Carolina. During his stay at Camp LeJeune, his wife, except for the last one or two weeks when she was with her husband, continued to live at their Coventry residence. She received both mail and telephone calls there.

Mr. Kingman was reassigned to Vietnam. He and his wife returned to Rhode Island on June 27 or 28 where he remained on leave until the 18th or 19th of July, during which time they were continually in residence at 418 Arnold Road. During this period they took several day trips to visit friends but never spent a single night away from home. While he was in Vietnam, his wife was not employed and continued to live at their home. Occasionally she spent as many as two nights each week at her parents' home in Providence. She received her mail in Coventry and telephone calls from her husband and she testified that her neighbors knew that her husband was in the service.

On June 12, 1968, after settlement negotiations ceased, plaintiff's attorneys prepared a summons and complaint against Robert Kingman which they forwarded to the sheriff in Kent County for service on Kingman. These were received in the sheriff's office on June 21, 1968. Since the efforts made by plaintiff's attorneys are determinative of the the ultimate issue in this case, we shall review them in some detail. The testimony pertaining to such efforts is in substance as follows.

One of Mr. Decof's partners at the time, Alan Dworkin, Esq., testified that when the summons and complaint was not returned "right away" he made several telephone calls to the sheriff's office to find out whether service had been made and to "prod them" to accomplish service. He was informed that the sheriff was " * * * having a very difficult time serving Mr. Kingman. That he couldn't. He had been out there. The house looked vacant * * *." The summons and complaint was returned to him with no service of any

kind made. After discussing the situation with Decof, Dworkin sent it back to the sheriff on August 14, 1968, with a letter stating that he was returning the writ and that

> "The statute of limitations expires on September 5, 1968, and I would like to have Mr. Kingman served.
>
> "If you cannot do so, would you please return the writ marked non est inventus."

On the same day he wrote to the Registry of Motor Vehicles requesting a confirmation of Kingman's driver's license, address and the name of the owner of the license plate under which the vehicle was registered. The registry's response, which he forwarded to the sheriff, indicated that Kingman's address was 418 Arnold Road, Coventry, and that he had a commercial registration for which he had returned the plates on July 30, 1968, having sold his pick-up truck.

On August 23, 1968, the sheriff returned the complaint and summons with his *non est inventus* return endorsed thereon and with a note stating:

> "I have made a visit to 418 Arnold road 4 times this last week and it is my opinion that no[one] has been there at all lately."

Mr. Dworkin then called Howard Tragger of defendant company and told him of the difficulty he was having serving Kingman and asked if there was any information that defendant might have. Mr. Tragger said he would check and call if he had anything on an address change. Mr. Dworkin did not hear from Tragger after that.

After the *non est inventus* was received, Mr. Dworkin went to 418 Arnold Road on two occasions. To him "[t]he place looked actually abandon[ed] at that time." He asked some children who were in the area if they knew where the residents of the house might be, but the children were able to offer no information. The sheriff had previously told Dworkin that he had "looked in and he didn't see any kind

of life," and that he had checked with neighbors. The sheriff also told him in the early part of August that another sheriff had visited 418 Arnold Road several times and that together he and the other sheriff had been there many times and that there seemed to be no one there. Mr. Dworkin asked him to try to continue to serve the writ.

Prior to the *non est inventus* return, Mr. Dworkin had checked the tax records which indicated ownership of the house as being in the Kingmans. He also asked his associate, John H. Hines, Jr., to check with the police. Mr. Hines checked with the police departments of Coventry and Smithfield and both departments reported back that they did not have any additional information other than that Kingman was supposed to be at 418 Arnold Road. Mr. Hines also contacted plaintiff but the latter did not have any information. Mr. Hines' contacts with the police were on August 23 or the day after. Mr. Hines also testified that he, Decof and Dworkin had discussed service on the Registry of Motor Vehicles pursuant to the provisions of §27-7-2, but decided not to do so because they had every reason to believe that Kingman was still a resident of Rhode Island.

It appears from the transcript that two sheriffs were involved with the service of the writ in this case. The first was Ray Fish. The parties stipulated that if Sheriff Fish were called he would testify that he had no recollection with respect to this case at all. Sheriff Leon Andrews, Jr. appeared as a witness. He testified that the complaint and summons first came into his hands "on or about the end of July or the first of August," after it "had been returned by Mr. Fish to Mr. Dworkin and he had returned it to the sheriff's office with an urgent request to make further effort to serve it * * *."

Sheriff Andrews' testimony in substance is as follows. Kingman's residence lay within the route between the sher-

iff's office and Andrews' home. After the court had let out in the evening or when he left his office when there was no court in session in the middle of the day, he would try to serve writs on his way home. He rode with his wife sometimes in the evening after supper to try to serve the writs. Of the many times he had gone there he never found any indication that there was anyone there. During the time before the *non est inventus* return he tried to serve the writ at least every other day, and on the week prior to the *non est inventus* he was there every day both during the daytime and in the evening. On at least one occasion he looked in the side windows of the house and it appeared to him that nothing was being used or disturbed. He checked with the neighbor next door who was able to give him no information. This was the only inquiry he made locally because there seemed to be no one in the area close enough to know anything about it. He further testified that

> "There was another house on the other side. Apparently no one was home there when I attempted to inquire. I couldn't find anybody."

Mr. Dworkin's secretary testified that for a week around August 23, 1968, she made repeated telephone calls to Kingman's house. She called at least three times each day, at eight or nine in the morning, and about one o'clock, and again around four-thirty or five in the afternoon.

Finally, on September 3, 1968, plaintiff filed the instant action against defendant insurance carrier. The return indicates that a copy of the complaint and summons was served on defendant on September 5, 1968. Mr. Decof testified that he waited until the last day because they wanted to exhaust every possible means of finding Kingman and that it was in the last instant when they could not find him that they filed suit against the insurance company.

The trial justice instructed the jury, in part, as follows:

."This means that the plaintiff through his attorneys must make a reasonably diligent effort to obtain service of the summons and complaint on the insured as if no question of insurance were involved. So this is the issue before you and the only issue before you. Did the plaintiff's attorneys make a reasonably diligent effort to serve Robert Kingman in a manner authorized by law prior to September 5, 1968, when the suit was commenced against Home Indemnity? If your answer to that question is 'yes' * * * then your verdict on this issue shall be for the plaintiff. If your answer to the question is 'no', that is to say, that you decide a reasonably diligent effort was not made to serve Robert Kingman then your verdict on this issue shall be for the defendant."

Then he defined what a reasonably diligent effort is and the method of service authorized by law as follows:

"That means doing everything possible that a reasonable man would do to effect service on Kingman as if no insurance at all were involved. The method provided by law for service on an individual is by delivering a copy of the summons and complaint to him personally anywhere in the state of Rhode Island or by leaving a copy of the summons and complaint at his dwelling house or usual place of abode with someone of suitable age and discretion then residing therein. It is undisputed in this case that Robert Kingman's civilian dwelling or usual place of abode throughout the period in question was 418 Arnold Road in Coventry, Rhode Island. Therefore, you have to determine whether reasonable diligent efforts were made to secure service on him either personally at that address or anywhere else in the state of Rhode Island or by leaving a copy of the summons and complaint with an adult residing at that address."

The trial justice also charged that the burden of proof was on plaintiff to prove his case by a fair preponderance of the evidence and he carefully explained the meaning of "fair preponderance of the evidence." He then instructed

them as to their function as fact-finders. He said, in part, that

"It is the function of the jury to consider the evidence introduced and to determine therefrom what are the facts. It is the duty of this court to decide questions of law and to instruct you in the law applicable to the case, but it is for you to apply that law to the facts as you determine the facts to be. Therefore, the factual situation in this case, what actually happened during the period of time that I've mentioned to you is for you to determine and for you alone * * *."

After considering the evidence in the light of this charge the jury brought in a verdict for plaintiff.

In passing on defendant's motion for a new trial the trial justice discussed his duty as set forth in *Barbato* v. *Epstein,* 97 R. I. 191, 196 A.2d 836 (1964). He noted that in the case at bar there was very little weighing to do and credibility to determine, since there was little evidence that was contradicted. He summarized the evidence by pointing out that plaintiff's attorneys testified as to what they did to locate Kingman, and the Kingmans testified as to where they were and what they were doing during the period in question. He said that the key to this case is the language in *Collier* v. *Travelers Ins. Co.,* 97 R. I. 315, 197 A.2d 493 (1964), where the court said that good faith on the part of the plaintiff means that plaintiff must exercise reasonably diligent efforts to secure service on the insured as if no insurance were involved. He posited the issue in the following language:

"What would a reasonable man have done to secure service upon an individual knowing that the statute of limitations was about to run out and knowing that there was no insurance company to serve?"

The trial justice did not fault plaintiff's attorneys for waiting until June, 1968 to commence suit against Kingman, but he said that from that time forward they had to exercise reasonably diligent efforts because they knew that

the statute of limitations absent any extraordinary circumstances would run out on September 5, 1968. He then reviewed what they did from June, 1968 until early August when the complaint and summons was returned to plaintiff's attorneys with a notation from the sheriff that they had been to Kingman's residence on several occasions but could find no one there.

He next referred to the period from August forward as "a crucial period" and asked:

> "What would reasonably diligent attorneys do under those circumstances if they knew that there was no insurance company and that service had to be made before September 5 in order to escape the devastating effect of the statute of limitations?"

He then reviewed what plaintiff's attorneys did during that period. He expressly referred to Dworkin's testimony that he went to Kingman's house twice, but the trial justice noted that Dworkin admitted that " * * * he didn't ring a door bell or even try to look in a window." He also noted that Dworkin spoke to a child in the area and the child sort of shrugged and did not know anything. He again posed the question:

> "What would a reasonable attorney exercising diligent efforts to secure service before September 5 have done under those circumstances?"

He said:

> " * * * that at least two things would have been done if no insurance was in the picture. Number one, a complete canvass of the neighborhood would have been completed to find out just what happened to the Kingmans and where they were and what they were doing. There is ample evidence that there were plenty of houses in the area, in fact, two right nearby. Secondly, if the statute of limitations were about to run and there were no insurance wouldn't the reasonable attorney have secured a private detective or some associate in his firm to sit on those steps until somebody showed up? If nobody showed up for a period of time then

you couldn't fault anybody. Those are reasonable efforts that should have been exerted in this case. I can only conclude since those efforts were not attempted by plaintiff's attorneys that they somehow felt secure that there was an insurance company to serve on September 5 which is just what they did and they felt secure that they could prosecute their action. * * * *From the facts in this case as I find them, as I think a jury should find them, I am satisfied that this jury could not come to the conclusion that reasonable efforts had been attempted to secure service on Robert Kingman as if no insurance were involved.* Admittedly this is a difficult question for a jury to decide because they don't know how lawyers operate. They don't know about serving papers. They don't understand this area of the law so it is unfortunate that the Supreme Court has made it a factual issue * * *." (emphasis added)

In our judgment the trial justice erred in finding that the jury could not come to the conclusion that reasonable efforts had been attempted to secure service on Robert Kingman as if no insurance were involved. In setting aside the verdict he was applying the rule that where a trial justice's

" * * * judgment tells him that it [the verdict] is wrong because it fails to respond truly to the merits of the controversy and to administer substantial justice and is against the fair preponderance of the evidence." *Barbato* v. *Epstein, supra* at 194, 196 A.2d at 837 (1964); *Humes* v. *Schaller,* 39 R. I. 519, 522, 99 A. 55, 57 (1916); *Wilcox* v. *Rhode Island Co.,* 29 R. I. 292, 296, 70 A. 913, 915 (1908).

In passing on defendant's motion for a new trial, he accepted the testimony of the Kingmans. He did not reject any of the testimony presented by either side. *See Colvin* v. *Goldenberg,* 108 R. I. 198, 273 A.2d 663 (1971). In fact he said that there was very little weighing to do and very little credibility to determine since there was no conflict in the evidence. He felt that plaintiff's attorneys had not gone far enough. He said, as we have stated above, that

in the circumstances of this case a reasonable attorney exercising diligent efforts to secure service before September 5, 1968, would have done at least two things if no insurance was in the picture, namely, (1) made a complete canvass of the neighborhood, and (2) secured a private detective or some associate in his firm to sit on Kingman's steps until someone showed up. Since these two things were not done he disapproved the verdict.

The trouble with the trial justice's conclusion is that he apparently overlooked his own instructions by which he was bound. In *Collier* v. *Travelers Ins. Co., supra* at 322, 197 A.2d at 496, we said:

> " * * * prior to commencing action directly against the insurer by reason of a 'non est inventus' return, there is an obligation on plaintiff to have first reasonably exhausted the possibility of litigating the case on its merits in an action against the insured. Whether such an effort was made is a question of fact for the trier thereof in each instance."

Because of what the court said in that case, the trial justice had instructed the jury that they were the fact-finders and that it was their duty to determine on the basis of the evidence before them whether plaintiff's attorneys had made a reasonably diligent effort to make service on Kingman such as would be made if no insurance were involved. That instruction was not objected to and therefore was the law of the case. As such

> " * * * it was binding equally upon the judge in passing upon the motion for a new trial as it was upon the jury in resolving the factual issues." *Petitpas* v. *Merchants Mutual Ins. Co.,* 103 R. I. at 483, 238 A.2d at 753 (1968).

In the circumstances he cannot substitute his judgment for that of the jury in the absence of a showing that the jury's conclusion lacked reasonableness. As the court said:

> "It may well·be that the trial justice, if free to draw his own inferences from the evidence, would have been

352

inclined to reach a conclusion opposite to that arrived at by the jury. In the absence, however, of a showing that the selected inference lacked reasonableness or was less probable or natural than the one he preferred, the trial justice had no right to substitute his judgment on what inference should be drawn for the inference which the jury had already drawn." *Id.* at 483, 238 A.2d at 753.

Although not binding on him in passing on defendant's motion for a new trial, the following statement by the trial justice in passing on plaintiff's motion for a directed verdict after all the evidence was in supports, in a way, the fact that the jury's conclusion is not lacking in reasonableness. In denying plaintiff's motion he said:

"The Rhode Island Supreme Court has said that the question of whether reasonable diligence was exercised to secure service against the insured before an action can be brought against the insurer is a question of fact. Since it is a question of fact, and it is a question which a jury normally has to decide, the only time a court can grant a motion for a directed verdict under circumstances presented here is where reasonable men could not differ as to the result. It seems to me too obvious to require further discussion that reasonable men could differ based on the evidence that I've heard here as to whether reasonable efforts, reasonable diligence to secure service against the insured was exercised, and, therefore, it is typically a jury question so the motion for a directed verdict is denied."

In view of our conclusion that the trial justice erred in passing on the motion for a new trial, we give no weight to his decision. In the circumstances we have followed the appellate rule enunciated in our cases and have independently examined the record ourselves, without the benefit of his decision and appraisal, to determine if there is any competent evidence in the record, which if believed, would support the verdict. There is such evidence and therefore we do not disturb the verdict. *Lamont* v. *Central Real Estate Co.,* 110 R. I. 438, 445, 294 A.2d 195, 199

(1972); *Gilbert* v. *Girard,* 109 R. I. 68, 75, 279 A.2d 919, 923 (1971); *Landes* v. *Faella,* 106 R. I. 23, 28, 255 A.2d 724, 727 (1969).

During oral arguments we asked counsel to file supplemental briefs on the question of whether there should be a separate preliminary jury hearing, to determine the good faith test established in *Collier, supra,* or whether such an issue was more properly to be ruled on as a preliminary matter by the trial justice. In *Collier, supra,* we held that the good faith test was a precondition to permitting one to proceed directly against an insurer.

We note at the outset that neither party objected to the ruling of the trial justice who, when confronted on the miscellaneous calendar with a motion for a preliminary hearing on defendant's defense of lack of due diligence, assigned the case to the jury trial calendar for determination of the issue of due diligence. However we believe that this case presents an opportunity to examine this procedural question so that guidelines may be established for application in future cases involving this problem.

After examining the briefs filed by the parties we come to the conclusion that the better practice in cases involving this issue would be to have one hearing on both the question of due diligence and that of the merits. If at such hearing the trial justice decides that the evidence does not yield to the conclusion that plaintiff made a good faith effort to serve the insured, he would direct the jury to return a verdict for defendant. On the other hand, if the evidence was such that the only reasonable conclusion would be that plaintiff had made the required good faith effort to serve the insured, he would then submit the case to the jury for a determination on the merits, with an instruction that plaintiff had established as a matter of law that he had made a good faith effort to serve the insured. Finally, if the evidence is such that reasonable men could

differ thereon, he would then submit the question to the jury for special findings with instructions that (1) if they found for the plaintiff on the good faith issue, they were to proceed with a hearing on the merits, and (2) if they found against the plaintiff on that issue, then they should return a general verdict for the defendant.

The procedure herein set forth shall be followed in all cases tried in the Superior Court 90 days after this case has been filed.

The plaintiff's appeal is sustained and the judgment appealed from is reversed.

Petition to reargue denied.

Mr. Justice Powers participated in the decision but retired prior to its announcement. Mr. Justice Doris did not participate.

*Tobin, Decof, LeRoy & Silverstein, Leonard Decof, Max Wistow*, for plaintiff.

*Gunning, LaFazia, Gnys & Selya, Guy J. Wells*, for defendant.